Daniel G. Bogden
  United States Attorney,
Eric Johnson
  Chief, Organized Crime Strike Force,
Timothy S. Vasquez
  Assistant United States Attorney,
333 Las Vegas Boulevard South
Suite 5000
Las Vegas, Nevada 89101
(702)  388-6336/Fax: (702) 388-6418



FILED _____ _____ RECEIVED
_____ ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

MAR  2 8  2006

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

**UNITED STATES OF AMERICA,**

    Plaintiff

**vs.**

**MICHAEL GARDINER,**

    Defendant

**CR-S-04-084-RCJ(RJJ)**

**PLEA MEMORANDUM**

    THE UNITED STATES OF AMERICA, by and through United States Attorney Daniel G. Bogden, Assistant United States Attorney Eric Johnson (Chief, Organized Crime Strike Force) and Assistant United States Attorney Timothy S. Vasquez, and defendant Michael Gardiner,, with the advice and counsel of his attorneys, Anthony Sgro and Jonathan Powell, submit this plea memorandum.

## I. PLEA AGREEMENT

    The UNITED STATES and defendant have reached the following plea agreement, which is not binding on the court.

## A. ADVISEMENT AND WAIVER OF RIGHTS

The defendant acknowledges that he has received counsel and advice from his attorney, and that he understands that he is presumed innocent and has the right to maintain his plea of not guilty and require that the government prove his guilt beyond a reasonable doubt at trial. Defendant understands that he has a right to a trial and concomitant rights under the Constitution and laws of the United States, including:

**(1)** The right to proceed to trial by jury on the original charges, or to a trial by a judge if defendant and the United States both agree;

**(2)** The right to confront the witnesses against defendant at trial, and to cross-examine them;

**(3)** The right to remain silent, with such silence not to be used against defendant in any way;

**(4)** The right, should defendant so choose, to testify in defendant's own behalf at such a trial;

**(5)** The right to compel witnesses to appear at trial and to testify on defendant's behalf; and,

**(6)** The right to have the assistance of an attorney at all stages of such proceedings.

Defendant acknowledges that he has been advised, and understands, that by entering a plea of guilty defendant is waiving, that is, giving up, these rights as to any count to which he pleads guilty.

## B. GUILTY PLEA: COUNT TWO — SECURITIES FRAUD

Defendant has voluntarily agreed to waive the presumption of innocence, his right against self-incrimination, and his right to a trial and concomitant rights, and enter a plea of guilty to the charge in Count Two of the Second Superseding Indictment that he, aiding and abetting others, engaged in securities fraud in violation of 15 U.S.C. § 78j(b)

The UNITED STATES agrees to move to dismiss the remaining counts of the indictment as to this defendant after sentence is imposed on him pursuant to his guilty plea. The United States Attorney's Office for the District of Nevada will bring no additional charge or charges against defendant in the District of Nevada relating to the events alleged in the Second Superseding Indictment which culminated in this Plea Memorandum.

2

## C. ELEMENTS

Count Two charges that:

> From on or about June 1993, through January 2002, in the State and Federal District of Nevada and elsewhere within the jurisdiction of this Court,
>
> DIANA LEE FLAHERTY, and
> MICHAEL GARDINER,
>
> the defendants herein, unlawfully, aiding and abetting one another and others known and unknown, willfully and knowingly, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 (17 C.F.R. Section 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading, and (c) engage in acts, practices and a course of business, which would and did operate as a fraud and deceit upon prospective investors in connection with the purchase and sale of a security.
> All in violation of Title 15, United States Code, Section 78j(b).

In order for the defendant to be found guilty of this offense, the government would have been required to prove at trial, or the Court must find for purposes of accepting his guilty plea, each of the following four (4) elements.

First, the defendant directly or indirectly participated in a scheme to defraud someone, or made an untrue statement of a material fact, or failed to disclose a material fact which resulted in making the defendant's statements misleading;

Second, the defendant committed at least one fraudulent act or omission in connection with the purchase or sale of securities, that is, in connection with the purchase or sale of stocks or investment contracts;

Third, the defendant did so by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange; and

3

<u>Fourth</u>, the defendant acted with the intent or purpose of defrauding buyers of the securities.

Defendant acknowledges that under federal law, "securities" have been broadly defined to include virtually any instrument that might be sold as an investment and specifically include, stocks. Defendant has also been informed that to defraud someone means to make a statement or representation which is untrue and known to the defendant to be untrue, or knowingly to fail to state something which is necessary to make other statements true, and which relates to something material to the purchase or sale.   Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.

## II.  FACTUAL BASES FOR GUILTY PLEAS

### A.  AFFIRMATIVE ADMISSION OF GUILT

The defendant affirmatively states that he is pleading guilty because he is in fact guilty of offenses charged in Count Two.

### B.  STIPULATION OF FACTS

The defendant admits and stipulates that if he had elected to go to trial instead of entering a guilty plea, the UNITED STATES could have presented sufficient competent evidence to establish the defendant's guilt beyond a reasonable doubt. The defendant specifically admits and declares under penalty of perjury that all of the facts set forth below are true and correct.

(1)   Gold and platinum group metals are naturally occurring element that is dispersed in low concentrations throughout the earth's crust.  Small or trace amounts of gold occurs or is present in most natural substances including basaltic scoria of "volcanic cinders."  However, it is currently technologically and economically not feasible to extract gold and platinum group metals found in "average crustal abundance;" precious metals can only be profitably mined where it is found in sufficiently high concentrations or deposits to permit economical extraction of the gold.

4

(2) Beginning in or around 1993, Robert F. Flaherty and DIANA LEE FLAHERTY combined and conspired to represent to others that they, or their corporations, had the capacity to commercially and profitably extract gold from volcanic cinders.

    (a) During the period from 1993 to December 2001, Robert F. Flaherty and DIANA LEE FLAHERTY owned controlling interests in Robert F. & Diana L Flaherty, Inc. (hereinafter "Flaherty, Inc.") and Phoenix Metals U.S.A. II, Inc. (hereinafter "Phoenix Metals").   During that span, DIANA LEE FLAHERTY actively participated in the management of Phoenix Metals and managed the accounts of Flaherty, Inc. Following Robert F. Flaherty's death in December 2001, DIANA LEE FLAHERTY assumed sole control of Phoenix Metals. (By December 2001, Flaherty, Inc. was defunct.)

    (b) Robert F. Flaherty and DIANA LEE FLAHERTY offered securities of Flaherty, Inc., and Phoenix Metals to prospective investors.   Robert F. Flaherty and DIANA LEE FLAHERTY additionally offered shares of Phoenix Metals to that corporation's employees and associates in lieu of wages.   To persuade others to purchase or accept their corporations' securities, Robert F. Flaherty and DIANA LEE FLAHERTY made representations to others regarding the corporations' activities, capabilities and assets.

    (c) While the representations of Robert F. Flaherty, DIANA LEE FLAHERTY, and their agents took many forms and channels, the recurring themes of their representations were the claims: that Robert F. Flaherty, DIANA LEE FLAHERTY, or their corporations, held proprietary technology capable of commercially and profitably producing gold and platinum group metals from volcanic cinders; that production of gold and other precious metals had commenced or was soon to commence; and that the Flahertys and/or their corporations owned or had rights to vast deposits of volcanic cinders containing economically recoverable precious metals worth millions or billions of dollars.

(3)   **MICHAEL GARDINER** contracted with Phoenix Metals to help raise capital by promoting the corporation in late 1999 through January 2002.  Relying on representations made to him by Robert F. FLAHERTY and DIANA LEE FLAHERTY, **GARDINER** purchased shares of Phoenix Metals stock at a discounted price as part of the compensation that he received for his services.

(4)   Although Robert F. FLAHERTY and DIANA LEE FLAHERTY continuously represented to **GARDINER**  and others that Phoenix Metals had the capacity to commercially produce gold  and other precious metals from volcanic cinders and that production was imminent, these representations could not withstand scrutiny.

(a)   On September 29, 1997, more than two years before  **GARDINER** joined Phoenix Metals, the Securities and Exchange Commission ("SEC") brought a civil complaint in the United States District Court for the Central District of California against Phoenix Metals and Robert F. FLAHERTY alleging, *inter alia,* that the defendants in that action had made fraudulent misrepresentations in connection with the sale of the corporation's stock in violation of Title 15, United States Code, Section 78j(b).  More specifically, the complaint alleged  that Robert F. FLAHERTY, Phoenix Metals, and their agents and affiliates: falsely represented that they owned volcanic cinders;  falsely represented that they owned cinder ore processing facilities and equipment; falsely represented that they owned a proprietary extraction process; and falsely represented that Robert F. FLAHERTY and Phoenix Metals had the ability to produce precious metals on a commercially viable basis.  On January 30, 1998, Robert F. FLAHERTY and Phoenix Metals waived a hearing and findings of fact regarding the Securities and Exchange Commission's complaint, and consented to entry of a Judgment of Permanent Injunction.  The Judgment of Permanent Injunction and Other Relief entered on February 2, 1998, provided in part:

6

Phoenix Metals and FLAHERTY, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them who receive actual notice of this Judgment . . . are permanently restrained and enjoined from, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange:

A. employing any device, scheme, or artifice to defraud;

B. making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

C. Engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security; in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**(b)** During the period from 1994 to May 1995, Don Nooe and Minerals World, Inc. processed approximately 675 tons of volcanic cinders on behalf of Phoenix Metals near El Paso, Texas, and purportedly produced thousands of pounds of precious metals doré. Although the processing of volcanic cinders in El Paso preceded MICHAEL GARDINER's participation in Phoenix Metals, its repercussions were manifest during his tenure.

**(I)** On or about July 19, 1995, Phoenix Metals entered into an agreement to sell Allen Thompson and Sunrise Mortgage Corporation of Tennessee doré bars purportedly worth three hundred thousand dollars ($300,000) or more. Over the ensuing months, Sunrise Mortgage used the purported doré to secure a loan from 900 Capital Services, Inc., in the sum of one hundred thirty-four thousand dollars ($134,000) to purchase eighty-four pounds of doré from Phoenix Metals. Sunrise Mortgage failed to repay this loan, and 900 Capital Services acquired the doré but soon discovered that the doré did not contain any appreciable gold or other precious metals and was almost worthless. In April 1997, 900 Capital

7

Services, Inc., brought a civil action against Phoenix Metals, Robert F. FLAHERTY, DIANA LEE FLAHERTY, and others, alleging that Phoenix Metals, through its principals Robert F. FLAHERTY and DIANA LEE FLAHERTY, had participated in a scheme to defraud 900 Capital Services, Inc. This lawsuit continued through **GARDINER's** tenure at Phoenix Metals. In June of 2001, Robert F. FLAHERTY, DIANA LEE FLAHERTY, and Phoenix Metals agreed to a substantial settlement. In a subsequent quarterly report filed with the Securities and Exchange Commission, DIANA LEE FLAHERTY provided a synopsis of the litigation and the terms of the settlement:

> On February 24, 1999, a default was entered against the Company in the amount of $597,913. The judgment stems from a disputed transaction in the period prior to July 1, 1997. On November 29, 1999, the court entered an order of final judgment, including additional interest, of $609,912. The court entered an order granting the Company's motion for an appeal of the judgment. On June 1, 2001, the parties to the litigation entered into a settlement agreement whereby the Company agreed to pay $275,000 to the plaintiff pursuant to a payment schedule through June 1, 2005, as full and final settlement of the matters between and among the parties to the litigation. However, to the extent that the Company provides total principal payments of $250,000 to the plaintiff by June 1, 2002, the Company and the Company's majority stockholders will have satisfied their entire obligation under the settlement agreement. As of February 15, 2002, the Company had not made the January and February payments under the settlement agreement.

(ii)   Phoenix Metals' purported doré bars were stored in metal drums. These drums were initially housed in a warehouse in El Paso, Texas, where two (2) of the drums were seized by agents of the Federal Bureau of Investigation in 1998. Eleven (11) additional drums containing Phoenix Metals purported doré were located and seized in Bismark, North Dakota, on July 7, 1999. Analysis of random samples of these materials revealed that the purported doré did not contain any detectable gold or platinum group metals. Rather, while a few of the

8

bars contained small amounts (less than 4%) of silver, they were comprised primarily of copper, iron and other base elements.

(c) Beginning in or about March 1998, Phoenix Metals occupied a refinery or mill situated on public lands near Searchlight, Nevada. Over the ensuing years, Phoenix Metals processed several tons of volcanic cinders at this site. Investors were frequently invited to the mill-site where they were treated to demonstrations of the smelting of cinders in furnaces and the pouring of the molten lava into molds and the display of bars of purported precious metals doré. However, these purported doré bars did not contain any appreciable precious metals and were not salable (except, perhaps, as scrap iron). The Bureau of Land Management ("BLM") instituted formal proceedings in September 1999 to remove Phoenix Metals purported refinery from public lands. In the course of those proceedings, independent assays established that the cinders processed by Phoenix Metals do not contain commercially viable amounts of gold or other precious metals. Following public hearings, an Administrative Law Judge with the U.S. Department of the Interior found that Phoenix Metals' purported technique for extracting precious metals from cinders has no scientific or technological validity, and the volcanic cinders purportedly processed at the mill site did not contain any valuable mineral content. Following an administrative appeal, the Bureau of Land Management revoked Phoenix Metals' mill site claim in August 2001.

(d) Notwithstanding Robert F. Flaherty's and DIANA LEE FLAHERTY's repeated representations, Phoenix Metals did not produce gold or precious metals on an economically viable basis during **GARDINER's** tenure with Phoenix Metals. Indeed, despite circulating dubious assays and processing volcanic cinders over a span of approximately eight years at refineries in both Searchlight and El Paso, Phoenix Metals never actually produced any salable gold or other precious metals.

9

(5)  Although **MICHAEL GARDINER** had initially relied in good faith on the representations of DIANA LEE FLAHERTY and Robert F. FLAHERTY regarding the assets and capabilities of Phoenix Metals, it was manifest by no later than September 2001 that Phoenix Metals had not produced any salable gold or precious metals, and did not have the capacity to produce gold or other precious metals on a commercially viable basis.

(6)  Despite the corporation's expulsion from public lands and inability to extract or produce precious metals, DIANA LEE FLAHERTY perpetuated the "gold from cinders" scheme and continued to make misrepresentations for purposes of promoting and selling shares of Phoenix Metals U.S.A. II, Inc., through at least January 2002. Unbeknownst to either DIANA LEE FLAHERTY or **GARDINER,** one of the prospective investors was actually a confidential source of the Federal Bureau of Investigation ("FBI") who was participating in the investigation of Phoenix Metals. During the period from November 2001 through January 2002, the confidential source posed as a prospective investor in Phoenix Metals. In a series of telephone calls and meetings, DIANA LEE FLAHERTY and **GARDINER** attempted to persuade the confidential source to purchase shares of Phoenix Metals stock. Towards this end, **GARDINER** aided and abetted DIANA LEE FLAHERTY in making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading. More specifically, DIANA LEE FLAHERTY and **MICHAEL GARDINER,** made representations to the effect that Phoenix Metals had the capability to produce gold on a commercially viable basis, and that production of precious metals was imminent. As the defendant then knew, these representations were untrue.

### III.  PENALTIES

**A.   STATUTORY PENALTIES**

**(1)   Imprisonment**

The statutorily authorized penalty for conspiracy securities fraud in violation of 15 U.S.C. § 78j(b) includes a term of not more than 10 years imprisonment.

**(2)   Fine**

The statutorily authorized penalty for a violation of 15 U.S.C. § 78j(b) includes a fine of not more than one million dollars ($1,000,000).

**(3)   Supervised Release**

The defendant is subject to supervised release for a term not to exceed three (3) years following any term of imprisonment imposed for the felony charged in Count Two.  *See* 18 U.S.C. § 3583(b).  Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if he violates one or more of the conditions of supervised release, he may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

**(4)   Special Monetary Assessment**

The defendant must pay a special assessment of one hundred dollars ($100) for each count of conviction.

**(5)   Restitution**

Defendant understands and acknowledges that the court may order him to make restitution to any victim of his offense.  *See* 18 U.S.C. § 3663.  Defendant agrees to make full restitution in an amount to be determined by the Court, which defendant agrees shall include all relevant conduct as determined by the Court.  Defendant understands that any restitution imposed by

the Court may not be discharged in whole or in part in any present or future bankruptcy proceeding.

**(6) <u>Costs</u>**

The defendant is required to pay for the costs of imprisonment, probation, and supervised release, unless the defendant establishes that he does not have the ability to pay such costs, in which case the court may impose an alternative sanction such as community service.

**B. <u>RULE 11(C)(1)(B) ADVISEMENT: COURT IS NOT BOUND BY PARTIES AGREEMENT</u>:**

Defendant acknowledges that this Plea Memorandum is submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and that the Court is not bound by the parties agreement nor the calculations and recommendations contained herein. Defendant understands that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which the defendant pleads guilty, and any sentence to be imposed in this case is within the sound discretion of the sentencing judge in accordance with the Sentencing Guidelines (including the Policy Statements, Application, and Background Notes contained in the Guidelines Manual). The parties agree that the Guideline calculations recommended herein are based on information now known and could change upon investigation by the United States Probation Office. It is possible that factors unknown or unforeseen by the parties to the plea agreement may be considered in determining the offense level, specific offense characteristics, and other related factors. In any event, if the Court should impose a sentence in excess of the sentence anticipated or recommended by the parties, the defendant cannot withdraw his plea of guilty.

**C. <u>ADVISORY SENTENCING GUIDELINE CALCULATIONS</u>**

Defendant understands that the court is required to consider United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") among other factors in determining defendant's sentence. Defendant understands that the Sentencing Guidelines are advisory, and that after

considering the Sentencing Guidelines, the court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.  Defendant understands and acknowledges that the court may consider any counts dismissed under this agreement, along with all other relevant conduct whether charged or uncharged,  in determining the applicable sentencing guidelines range, the propriety and extent of any departure from that range, and the determination of the sentence to be imposed after consideration of the sentencing guidelines and all other relevant factors.   The parties jointly recommend the following calculations of the defendant's Offense Level under the Sentencing Guidelines.

(1)  **Base Offense Level:    6**                                      [USSG § 2B1.1(a)]

Sentencing Guidelines § 2B1.1 prescribes a Base Offense Level of 6 for defendant's offenses.

(2)  **Specific Offense Characteristics:  + 10**

For the limited purposes of this plea agreement, defendant **GARDINER** admits that he recognized that Phoenix Metals was incapable of producing gold or other precious metals by the conclusion of the BLM proceedings in August 2001.  Therefore, for the limited purposes of this plea agreement, the parties stipulate and agree that defendant **GARDINER** should be held accountable only for his misrepresentations occurring after September 2001.  The parties additionally agree that the Specific Offense Characteristics under the Sentencing Guidelines should be assessed as follows.

(a)  **Amount of Actual and Intended Loss:  + 8**          [USSG § 2B1.1(b)(1)]

For purposes of the plea agreement, the parties stipulate that defendant GARDINER should be held accountable for attempted or intended losses in the sum of more than $70,000, but less than $120,000.  This intended financial loss warrants an 8 Level enhancement under Sentencing Guidelines § 2B1.1(b)(1).

(b)  **Number of Victims:  + 0**                               [USSG § 2B1.1(b)(2)]

Although the larger conspiracy between DIANA LEE FLAHERTY and Robert F. FLAHERTY had scores of victims, the parties stipulate for purposes of this plea

13

agreement that there were fewer than ten victims during the period in which the defendant *knowingly* participated in the conspiracy. An enhancement under Sentencing Guidelines § 2B1.1(b)(2) is therefore inappropriate.

**(c)** <u>**Violation of Prior Injunction:  + 0**</u>  [USSG § 2B1.1(b)(7)©]

Defendant **GARDINER** was neither an officer or agent of Phoenix Metals nor a member of the conspiracy at the time of the prior injunction in the SEC's civil action. An enhancement under Sentencing Guidelines § 2B1.1(b)(7)© is therefore inapplicable as to this defendant.

**(d)** <u>**Sophisticated Means:  + 2**</u>  [USSG § 2B1.1(b)(8)]

From its inception to its conclusion, the scheme charged in Count Two involved an extraordinarily complex and intricate scheme to promote and sell securities of FLAHERTY, Inc. and Phoenix Metals.  For example, Robert F. FLAHERTY and DIANA LEE FLAHERTY went to elaborate lengths and expense to create and maintain the facade that Phoenix Metals possessed the capacity and had either commenced or was soon to commence producing gold and precious metals on a commercially viable basis.  While the many layers and instruments of this scheme were devised prior to defendant **GARDINER's**  knowing participation, defendant **GARDINER** aided and abetted DIANA LEE FLAHERTY in the perpetuation of these misrepresentation in their dealings with the confidential source in December 2001 and January 2002.  Defendant's Base Offense Level should accordingly be increased by 2 Levels pursuant to Sentencing Guidelines § 2B1.1(b)(9).

**(e)** <u>**Corporate Officer:  + 0**</u>  [USSG § 2B1.1(b)(15)(A)(I)]

Defendant **GARDINER** was not an officer of Phoenix Metals. An enhancement under Sentencing Guidelines § 2B1.1(b)(15)(A)(I) is therefore inapplicable to him.

14

**(3)    Role:    -2**                                                         [USSG § 3B1]

The parties stipulate that defendant was substantially less culpable than the others involved in this offense, and recommend a 2 level downward Mitigating Role adjustment under Sentencing Guidelines § 3B1.1.

**(4)    Acceptance of Responsibility:    - 2**                               [USSG § 3E1.1(a)]

Pursuant to Sentencing Guidelines § 3E1.1(a), the UNITED STATES will recommend that defendant receive a two-level downward adjustment for acceptance of responsibility if he: (a) admits a complete factual basis for the guilty plea at the time it is entered; (b) is truthful with the Court and probation officers; (c) fully admits and accepts his involvement in the offense; (d) enters (and does not attempt to withdraw) a guilty plea; (e) does not engage in further criminal conduct; (f) appears in court as scheduled; and (g) does not obstruct justice. [Under the parties' Sentencing Guideline calculations, the defendant is not eligible for an additional 1 level adjustment under USSG §3E1.1(b) because defendant's adjusted offense level is less than 16 following a Mitigating Role adjustment that precedes application of any adjustment for acceptance of responsibility. *See generally* USSG § 1B1.1 (adjustments for role precede any adjustment for acceptance of responsibility).]

**(5)    Final Offense Level:    12**

Under the terms of this plea agreement, defendant's Adjusted Offense Level would be 12 following adjustments for the Specific Offense Characteristics and a 2 level downward adjustment for his Mitigating Role, and a 2 level reduction for Acceptance of Responsibility. The parties agree that no other adjustments or enhancements are applicable or appropriate.


**D.  Other Sentencing Matters**

**(1)    Criminal History:**

Defendant understands and acknowledges that his sentence in this case may be determined, in part, by his criminal record or criminal history.    The parties do not enter into any

1      stipulation regarding defendant's criminal history.  Defendant understands that his Criminal

2      History Category will be determined by the court.

3    **(2)**   **United States' Recommendation:**   If the UNITED STATES does not move for a

4      downward departure, it shall retain discretion to recommend a sentence that it deems

5      appropriate.

6    **(3)**   **Supplemental Information:**   Both defendant and the United States are free to: (a)

7      supplement the facts by supplying relevant information to the United States Probation Office

8      and the court, and (b) correct any and all factual misstatements relating to the calculation of

9      the sentence.

10

11 

## IV.  ADDITIONAL TERMS & CONDITIONS

12 **A.  WAIVER OF APPEAL**

13      In exchange for the concessions made by the United States in this plea agreement, defendant

14 knowingly and expressly waives the right to appeal any sentence that is imposed within or below the

15 applicable Sentencing Guideline range as determined by the Court, further waives the right to appeal

16 the manner in which that sentence was determined on the grounds set forth in Title 18, United States

17 Code, Section 3742, and further waives the right to appeal any other aspect of the conviction or

18 sentence, including any order of restitution. Defendant reserves only the right to appeal any portion

19 of the sentence that is an upward departure or higher than the sentencing guideline range determined

20 by the court. Notwithstanding the stipulations in this agreement, the parties are free to argue on appeal

21 and collateral review that the court's sentencing guidelines calculations are not error. However, each

22 party agrees to maintain its view that the calculations recommended herein are consistent with the facts

23 of this case.

24

25

26

**B.   ADMISSIBILITY OF STIPULATION**

In exchange for the UNITED STATES promises and recommendations in this agreement, defendant agrees:

**(1)**   The facts set forth in Section IV of this Plea Agreement shall be admissible against defendant under Fed. R. Evidence. 801(d)(2)(A) for any purpose at sentencing, and in any subsequent proceeding, including a trial in the event defendant does not plead guilty or withdraws his guilty plea, to impeach or rebut any evidence, argument or representation offered by or on defendant's behalf; and

**(2)**   Defendant expressly waives any and all rights under Fed. R. Criminal P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Section IV of the Plea Agreement to the extent set forth above.

**C.   COOPERATION WITH LAW ENFORCEMENT**

**(1)**   **Truthful Information and Assistance:**  As part of the consideration for the promises and recommendations contained in this plea agreement, defendant agrees to cooperate fully, truthfully and forthrightly with law enforcement agents (including probation officers) and government attorneys, and to provide all information known to him regarding any criminal activity (including the facts and circumstances of this case), and understands and acknowledges that the information he provides can be used against him to establish relevant conduct.  Defendant agrees, if requested by the United States, to provide complete and truthful information and testimony concerning his knowledge of all other persons who are committing or have committed offenses against the United States, and agrees to cooperate fully with the United States in the investigation and prosecution of such persons.  In this regard:

**(a)**   Defendant agrees to remain available for debriefing and pre-trial conferences as the government may request;

17

  **(b)** Defendant agrees to testify if called the government in any proceeding, and agrees to provide truthful, complete and accurate testimony and information on a continuing basis as requested by the government;

  **(c)** Defendant agrees to provide all documents, records, writings and tangible objects or materials of any kind in the defendant's possession or under the defendant's care, custody or control relating directly or indirectly to all areas of inquiry and investigation;

  **(d)** Defendant shall promptly turn over to the Government or other law enforcement authorities or direct such law enforcement authorities to any and all evidence of crime; all contraband and proceeds of crime; and all assets traceable to such proceeds of crime; and

  **(e)** Defendant shall submit a full and complete accounting of all his financial assets, whether such assets are in his name or in the name of a third party.

Further, as part of this Cooperation Agreement, the defendant agrees to inform the government of any and all criminal activity that he has participated in, and is not to engage in any further criminal activity.. Should the defendant fail to disclose prior criminal activity or engage in additional criminal activity, such conduct shall constitute failure to provide substantial assistance.

**(2)** **Substantial Assistance Determination:** If the UNITED STATES in its sole discretion determines that defendant has provided substantial assistance in the investigation or prosecution of a criminal offense, then the UNITED STATES will file a motion for downward departure, pursuant to Sentencing Guidelines § 5K1.1. The defendant agrees that a motion for downward departure based on substantial assistance shall not be made under any circumstances unless the defendant's cooperation is deemed to be substantial assistance by the United States Attorney. The United States agrees to consider the totality of the circumstances in determining whether defendant has provided substantial assistance which

would merit a motion by the United States for a downward departure from the applicable Guideline including, but not limited to: evaluation of the significance and usefulness of defendant's assistance; the truthfulness, completeness, and reliability of any information or testimony provided by defendant; the nature and extent of defendant's assistance; any injury suffered, or any danger or risk of injury to defendant or defendant's family resulting from defendant's assistance; and the timeliness of defendant's assistance. The UNITED STATES has made no promise, implied or otherwise, that the defendant will be granted a departure for substantial assistance.  Further, no promise has been made that such a motion will be made even if the defendant complies with the terms of this agreement in all respects but has been unable to provide substantial assistance as determined in the sole discretion of the United States Attorney.  If the government moves for a downward departure for substantial assistance, the government will not oppose defendant's request to be placed on probation without any confinement.

(3)  **Potential Downward Departure:** Defendant agrees that in the event the United States files a downward departure motion based upon defendant's substantial assistance, the United States reserves the right to make a specific recommendation to the Court regarding the extent of such a departure.    Defendant further understands and acknowledges that the final decision as to how much of a departure, if any, is warranted rests solely with the Court. Defendant understands that even if the UNITED STATES deems his assistance substantial and moves for a downward departure, the Court has discretionary authority to deny or grant such motion.  The amount or extent of any departure will be determined by the Court, and the Court's denial of a motion for departure or rejection of the government's recommendations would not be a basis for defendant to withdraw his guilty plea.

(4)  **Use of Information Against Defendant:** Subject to the exceptions set forth below, if the defendant abides by the terms of this agreement, he will be afforded direct-use immunity; that is, the UNITED STATES agrees that no statements made or  information provided by

19

the defendant will be used against him directly in any criminal prosecution in the District of Nevada. There are, however, certain exceptions or limits to this protection.

(a) **Breach of Agreement:** Defendant understands that his promise to cooperate requires that he provide full, complete, and truthful information and testimony. The defendant agrees that if the United States determines that the defendant has not provided full and truthful cooperation, or has committed any federal, state or local crime between the date of this agreement and the defendant's sentencing, or has otherwise violated any provision of this agreement, then: the agreement and any of its obligations hereunder may be voided by the United States in its sole discretion; and the defendant shall be subject to prosecution for all federal criminal offenses of which the United States has knowledge, including but not limited to, perjury and obstruction of justice. Any such prosecution may be based upon any information provided by the defendant or leads derived therefrom, and defendant waives any objection or motion that he might have to admission of such evidence under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, and any other statute or rule. Additionally, defendant understands and agrees that any breach of his promises contained in this agreement will not permit him to withdraw his guilty pleas.

(b) **Derivative Evidence:** The UNITED STATES may make derivative use of, and may pursue any investigative leads suggested by, any statements or information provided by the defendant, including the use of such derivative evidence in the criminal prosecution of the defendant.

(c) **Impeachment:**   If the defendant testifies in a manner inconsistent with any information previously provided by him pursuant to this agreement, he may be cross-examined, confronted and impeached by his statements.

20

**(d)**   **Disclosure under §5K1.1:** In the event that the UNITED STATES files a motion for a departure under Sentencing Guidelines § 5K1.1, any self-incriminating information, whether related or not to the offense for which defendant is pleading guilty, must be disclosed to the Court to be used in determining whether and to what extent a downward departure is warranted.

**(5)**   **Breach of Agreement:** Defendant agrees that if the United States determines that defendant has committed any federal, state or local crime between the date of this agreement and defendant's sentencing, or has otherwise violated any provision of this agreement, then (a) this agreement and any of the promises, recommendations and obligations hereunder may be voided by the United States in its sole discretion, (b) defendant may not withdraw the guilty plea, and (c) defendant shall be subject to prosecution for all federal criminal offenses of which the United States has knowledge, including but not limited to, perjury and obstruction of justice. Any such prosecution may be based upon any information provided by defendant or leads derived therefrom. Defendant further understands and agrees that, to establish a breach of this agreement, the Government need only prove Defendant's commission of a criminal offense by a preponderance of the evidence.

**D.**   **LIMITATIONS**

This Plea Agreement is limited to the United States Attorney's Office for the District of Nevada and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authority. However, this Plea Memorandum does not prohibit the United States through any agency thereof, the United States Attorney's office for the District of Nevada, or any third party from initiating or prosecuting any civil proceeding directly or indirectly involving defendant, including but not limited to, proceedings under the False Claims Act relating to potential civil monetary liability or by the Internal Revenue Service relating to potential tax liability.

## V.  ACKNOWLEDGMENT

### A.  ACCURACY OF MEMORANDUM OF PLEA AGREEMENT

The defendant, acknowledges by the defendant's signature below that the defendant has read this Memorandum of Plea Agreement, that the defendant understands the terms and conditions, and the factual basis set forth herein, that the defendant has discussed these matters with the defendant's attorney, and that the matters set forth in this memorandum, including the facts set forth in Part IV above are true and correct.

### B.  MEMORANDUM OF PLEA AGREEMENT IS COMPLETE AND EXCLUSIVE

The defendant, the defendant's attorney, and the attorney for the UNITED STATES acknowledge that this Plea Memorandum contains the entire agreement negotiated and agreed to by and between the parties, and that no other promise has been made or implied by either the defendant, the defendant's attorney, or the attorney for the UNITED STATES.

Daniel G. Bogden,
United States Attorney

28 MAR 2006
DATED

Timothy S. Vasquez,
Assistant United States Attorney

28/MAR/06
DATED

MICHAEL GARDINER
Defendant

3/28/06
DATED

Anthony Sgro / Jonathan Powell
Counsel for Defendant

22